<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NASIR DICKERSON, ASHON DICKERSON, PATRICIA DICKERSON, & STEFANIE DICKERSON, | Civil No. 19-cv-08450(KSH)(CLW) |
| *Plaintiffs*, | |
| v. | **OPINION** |
| WALLKILL VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUCATION & DAVID CARR, | |
| *Defendants*. | |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I.    <u>Introduction</u>**

Plaintiffs Nasir Dickerson ("Nasir"), a former student at Lenape Valley Regional High School, his father Ashon Dickerson ("Ashon"), his mother Stefanie Dickerson ("Stefanie"), and his grandmother Patricia Dickerson ("Patricia") (collectively, "plaintiffs") allege in their complaint that defendants Wallkill Valley Regional High School Board of Education ("the Board") and David Carr ("Carr"), the school's principal and superintendent, violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12 et seq., the Civil Rights Act, 42 U.S.C § 1983 et seq., and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, et seq.  Before the Court is the defendants'

motion to dismiss the complaint.  For the reasons set forth below, the Court denies defendants' motion.

## II.   <u>Background</u>

On February 13, 2019, Wallkill Valley Regional High School hosted a basketball game against Lenape Valley Regional High School.  (D.E. 1 ("Compl.) ¶ 3.)  Nasir, a student at Lenape Valley, was the only black player and his family, including Ashon, Stefanie, and Patricia, were the only other African Americans present.  (*Id.* ¶¶ 4, 6, 27.) Plaintiffs allege that spectators made monkey sounds and shouted the n-word and "monkey" at Nasir throughout the game and that neither referees nor school officials attempted to control the crowd.  (*Id.* ¶¶ 5, 7.)

Plaintiffs claim that the spectators' insults grew louder and more aggressive near the end of the game.  (*Id.* ¶ 8.)  As Nasir walked to the bench with a minute remaining, Ashon stood up and cheered for his son, who had scored 20 points despite the purportedly hostile conditions.  (*Id.* ¶ 11.)  As Ashon applauded, several spectators gave him the finger.  (*Id.* ¶ 12.)  Ashon returned the gesture.  (*Id.* ¶ 25.)  At this point, "it was clear [to plaintiffs] that the slurs were being directed toward Ashon, Nasir, Stefanie, and Patricia."  (*Id.* ¶ 12.)

Plaintiffs contend that, after Ashon sat back down, Carr and an armed security officer "aggressively approached" him and asked him to leave.  (*Id.* ¶ 13.)  Carr shouted at Ashon, "Get out!" to which Ashon replied, "Why, I'm a parent? Who do you think you're talking to like that? You don't hear them over there, you don't see them over

there?" (*Id.* ¶¶ 13-15.)  Carr directed Ashon to "Get up and [g]et out or [Ashon would]

be arrested." (*Id.* ¶ 16.)  The security guard escorted Ashon out of the gym, and Patricia

followed.  (*Id.* ¶ 17.)  After Carr and the security officer ejected him from the game,

Ashon was "considerabl[y] distress[ed]" and "fear[ed] for his life," especially given

recent press coverage about black men being shot.  (*Id.* ¶ 18.)  Nasir, Stefanie, and

Patricia feared for Ashon's life, as well as their own.  (*Id.*)  The racial slurs continued

after Carr ejected Ashon.  (*Id.* ¶ 19.)

After the game, Stefanie waited near the locker room because she was concerned

for her son's safety.  (*Id.* ¶ 20.)  When the family left the school, students yelled at them

in front of the security guard, "You don't belong here."  (*Id.* ¶ 21.)  Nasir and Stefanie

asked for assistance controlling the crowd from the security officer, who replied, "They

are under control why are you still here."  (*Id.* ¶ 22.)

According to the complaint, Nasir has been the victim of numerous hate crimes.

(*Id.* ¶ 10.)  The cumulative effect of racial harassment has caused him psychological

distress, post-traumatic stress disorder, anxiety, and depression.  (*Id.*)

The pending motion is directed at both counts of the complaint: count one,

alleging violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12 et

seq.,  and count two, alleging violations of 42 U.S.C § 1983 et seq., and the New Jersey

Civil Rights Act, N.J.S.A. 10:6-2, et seq.  The Court has jurisdiction over the plaintiffs'

federal claims pursuant to 28 U.S.C. § 1331 and may exercise supplemental jurisdiction

over the remaining New Jersey state law claims under U.S.C. § 1367.

## III.   Legal Standard

To survive dismissal under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true" to state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plausible claim is one that permits the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

To determine whether a plaintiff has met the facial plausibility standard mandated, courts engage in a three-step process.  *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "outline the elements a plaintiff must plead to state a claim for relief."  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).  Next, the Court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of trust."  *Id.*  Finally, where "there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.

## IV.   Preliminary Issues

### A.   Video evidence

When reviewing a Rule 12(b)(6) motion, the Court may only consider the facts alleged in the pleadings, documents attached thereto as exhibits, and matters of judicial notice.  *S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999); *Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.*, 998 F.2d 1192, 1196

4

(3d Cir. 1993).  If additional materials outside the pleadings are presented and the Court incorporates those materials into its analysis, the Rule 12(b)(6) motion will be converted, upon notice to the parties, into a summary judgment motion pursuant to Rule 56.  *See* Fed. R. Civ. P. 12(d), 56; *see also Slippi-Mensah v. Mills*, 2016 WL 4820617, at *2 (D.N.J. Sept. 14, 2016) (Hillman, J.).  However, as an exception to the general rule, the Court may also consider a document "integral to or explicitly relied upon in the complaint…without converting the motion to dismiss into one for summary judgment." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d. Cir. 2014) (quoting *In re Burlington Coat Factory Sec. Litg.*, 114 F.3d 1410 (3d. Cir. 2017)).

In their complaint, plaintiffs reference "video footage lasting over an hour" which they claim makes it "clear" that the spectators' behavior occurred as they described.  (Compl. ¶ 37.)  Plaintiffs did not attach this video to their complaint, nor did they further describe its contents.  However, in their opposition brief, they cite to the URL link of a third-party video available on YouTube and published by "Mugs Media."  Plaintiffs then direct the Court's attention to various timestamps where the racially harassing language can purportedly be heard on camera.  (D.E. 9 ("Opposition Brief") at 9-10.)  Plaintiffs make reference to this video numerous times throughout their brief.

Defendants argue that the Court must disregard the video footage because its use is improper, unsupported by law, and offered in bad faith, but "welcome a review of the video…as it will support their position that the allegations in the Complaint, and

in Plaintiffs' opposition brief, are largely false."  (D.E. 10 ("Reply Brief"), at 3-4.) Although a video may be considered at the motion to dismiss stage to "establish, for example, that a particular identifiable statement was made," the identities of the speakers in this video and the specific comments made may present issues of factual interpretation.

In *Liebler v. City of Hoboken*, 2016 WL 3965198, *2-3 (D.N.J. July 21, 2016), Judge McNulty had occasion to distinguish video footage from a written document.  Although a video might be useful to establish that a particular statement was made, the "context of the statements, the identities and tone of voice of the speakers, the discussions that may have preceded or surrounded the meeting, and so on, all present issues of factual interpretation" that could "distort the analysis" when viewed in isolation.  *Id.* at *3. Unlike a written document, the proffered video does not amount to "the sort of uncontroversial document that may itself settle the claims one way or the other."  *Id.* The Court declines to consider the video evidence at this stage of litigation.

## V.   <u>Discussion</u>

### A.   <u>Violations of § 1983 and the New Jersey Civil Rights Act (NJCRA)</u>

Plaintiffs failed to include a statement of jurisdiction in their complaint or moving brief.  In their second count, they allege violations of 42 U.S.C. § 1983 ("§ 1983").  It is this federal claim that provides the Court with jurisdiction over the case, which is not challenged.  28 U.S.C. § 1331.

In this second count, plaintiffs also allege violations of the New Jersey Civil Rights Act ("NJCRA").  The "NJCRA is interpreted as analogous to § 1983." *Szemple v. Correctional Med. Servs., Inc.*, 493 Fed. App'x. 238, 241 (3d Cir. 2012).  Therefore, the Court will "analyze…NJCRA claims through the lens of § 1983."  *Trafton v. City of Woddbury*, 7999 F.Supp.2d 417, 444 (D.N.J. 2011) (Hillman, J.); *see also Estate of Martin v. U.S. Marshals Serv. Agents*, 649 Fed. Appx. 239, 245 n.4 (3d Cir. 2016) (holding that "it appears undisputed that Plaintiffs' claims under the New Jersey Constitution and the New Jersey Civil Rights Act trigger the same legal elements and principles as…[the] federal causes of action [under § 1983]"); *Pettit v. New Jersey*, 2011 WL 1325614, at *3 (D.N.J. Mar. 30, 2011) (Hillman, J.) ("This district has repeatedly interpreted [the] NJCRA analogously to § 1983.")  As a result, the Court's analysis of plaintiffs' § 1983 claims will also apply to the plaintiffs' NJCRA claims in this case.

As a preliminary matter, it appears that plaintiffs' federal civil rights claims arise out of conduct experienced solely by Ashon and Nasir.  Plaintiffs characterize these claims as "the unequal treatment of people of color versus the lack of any action against people of non-color" (Opposition Brief, at 2) and the illegality of  "a public school district, by and through the acts and omissions of its principals and agents, to racially discriminate."  (Opposition Brief, at 22.)  As such, the Court will focus on the plaintiffs' allegation that Carr tolerated the crowd's hate speech and, in response to such behavior, chose to eject only Ashon from the game.

Section 1983 does not create substantive rights; instead, it "provides a remedy for the violation of rights created by federal law." *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). To establish a prima facie case under § 1983, plaintiffs must show "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of his rights, privileges, or immunities secured by the Constitution or laws of the United States." *Powell v. Ridge,* 189 F.3d 387, 400 (3d Cir. 1999); *see also L.S. v. Mount Olive Bd. of Educ.,* 765 F. Supp. 2d 648, 656 (D.N.J. 2011) (J., Debevoise).

In an action under § 1983, the Court must first identify the "exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (internal citations omitted). Here, plaintiffs have set forth a claim under the fourteenth amendment equal protection clause that "it is improper for a public school district, by and through the acts and omissions of its principals and agents, to racially discriminate." (Opposition Brief, at 22.)

### 1.   *Claims against David Carr*

With respect to claims against Carr in his personal capacity, defendants argue that qualified immunity requires the Court to dismiss both the federal and state claims. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v.*

*Callahan,* 555 U.S. 223, 129 S. Ct. 808, 172 L.Ed.2d 565 (2009) (internal quotations and citations omitted).   To determine whether qualified immunity applies, the Court considers two questions: (1) whether the official's conduct violated a constitutional or federal right; and (2) whether that right was "clearly established." *Ray v. Twp. of Warren,* 626 F.3d 170, 174 (3d Cir. 2010).

### i.  Did Carr violate plaintiffs' constitutional rights?

Although the Third Circuit has not addressed whether the fourteenth amendment's equal protection clause protects students from a school's deliberate indifference to student-on-student harassment, in *George v. Board of Edu. of Tp. Of Millburn,* a district judge adopted the Second Circuit's view that, in certain circumstances, school administrators may be liable for such willful inaction.  34 F. Supp. 3d 442, 460 (D.N.J. July 23, 2014) (Martini, J.) (citing *Gant ex rel. Gant v. Wallingford Board of Education,* 195 F.3d 134, 140-141 (2d Cir. 1999)).  An earlier decision by a different district judge reached a different conclusion.  *See Joyce v. Sea Isle City* 2008 WL 906266, at *17-18 (D.N.J. March 31, 2008) *on reconsideration in part sub nom. Joyce v. Sea Isle City,* 2008 WL 2875456 (D.N.J. July 23, 2008) (Kugler, J.).  In *Joyce,* the plaintiffs alleged that teachers and school administrators were deliberately indifferent to student-on-student racial harassment.  *Id.*  The *Joyce* court relied on *D.R. by L.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, 1369-73 (3d Cir. 1992), which concerned a school's liability under the due process clause  following incidents of student-on-student sexual assault.  In *D.R.,* the Third Circuit held the fourteenth amendment did not

impose a duty on administrators to prevent student-on-student harassment and rejected the notion that teachers and school administrators had a special relationship with students such that they owed them a duty of protection. *D.R. by L.R,* 972 F.2d at 1369-73. The *Joyce* court, in turn, held that the "acquiescence by school employees in the abuse suffered by [plaintiff] did not amount to a constitutional violation." *Joyce,* 2008 WL 2875456, at *18.

The *George* court rejected *Joyce's* reading of *D.R* and distinguished a due process clause case involving sexual misconduct from an equal protection clause case involving racial discrimination; "[d]iscrimination by fellow students—the conduct alleged in this case—differs from the sexual violence that is the focus of *D.R.* The *George* court noted that "[b]ecause *D.R.* failed to engage this issue, it is inapposite." *Id.* Because the facts in *D.R.* can be substantially distinguished from the present matter, such that the Court cannot satisfactorily apply them to plaintiffs' case, the Court is not bound by its holding.

In the absence of Third Circuit precedent on point, the Court adopts the Second Circuit's reasoning in *Gant*: "deliberate indifference to [student-on-student] harassment can be viewed as discrimination by school officials themselves." *Gant*, 195 F.3d at 140 (internal citations omitted.) To establish an administrator's deliberate indifference to racial harassment, the plaintiffs must prove that: (1) the child was in fact harassed by other students on account of his race; (2) such race-based harassment was actually known to the school official; and (3) the defendant's response to the harassment was so clearly unreasonable in light of the known circumstances as to give rise to a

reasonable inference that the defendant himself intended for the harassment to occur." *DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir. 2012). The ultimate inquiry therefore is whether the defendant himself possessed a "racially discriminatory purpose." *Id.* (quoting *Gant,* 195 F.3d at 141 (internal citations omitted)).

Here, plaintiffs have alleged that spectators, "most of whom appeared to be students and parents/or individuals with some affiliation to the Lenape and/or Wallkill Schools" called Nasir the "n-word" and directed monkey sounds at him. (Compl. ¶¶ 5, 7, 27.) Thus, they have sufficiently pled that Nasir was harassed on account of his race. They have also alleged that Carr was present during the game while the alleged racist conduct was ongoing. (*Id.* ¶ 7.) Defendants acknowledge that Carr attended the game but argue that "it is impossible to know what Defendant Carr knew" while the racist behavior was purportedly ongoing. (Reply Brief, at 11.) At this stage, however, the plaintiffs' allegation that Carr attended the game permits the reasonable inference that he was aware of the spectators' conduct, which they describe as an "obscene ruckus," and tolerated it. Finally, plaintiffs have alleged that, aside from ejecting Ashon, Carr did nothing to stop the spectators' behavior, nor did he direct anyone else to take action. Defendants attempt to cast doubt on the of plaintiffs' allegations by questioning their plausibility; they urge the Court to discredit the fact that a gym full of "parents, students, coaches, administrators, a security guard and referees" could have ignored such an "obscene ruckus," and thus, argue that Carr "acted reasonably in response to the circumstances." (D.E. 5 ("Moving Brief"), at 5-6, 26.) At this stage, however, the Court

is required to accept the plaintiffs' factual allegations as true.  As such, plaintiffs have pled sufficient facts to support a finding that Carr's failure to respond to fans and decision to eject Ashon was so unreasonable that one may infer that he acted with deliberate indifference.

### ii. Were plaintiffs' constitutional rights clearly established?

A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Good v. Dauphin County Soc. Servs. for Children & Youth,* 891 F.2d 1087, 1092 (3d Cir. 1989). To determine whether a right is clearly established, there need not be a case "directly on point," however, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd,* 131 S. Ct. 2074, 2083, (2011); *Fields v. City of Philadelphia*, 862 F.3d 353, 361 (3d Cir. 2017) (noting that clearly established rights are derived from either binding Supreme Court and Third Circuit precedent or from a "robust consensus of cases of persuasive authority in the Courts of Appeals.")  Government actors are entitled to qualified immunity unless they violate a constitutional right "so clearly established that 'every reasonable official would have understood that what he was doing violates that right.'"  *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d Cir. 2016) (quoting *Reichle v. Howards*, 566 U.S. 658, 659 (2012)).

There is a "longstanding principle that clearly established law should not be defined at a high level of generality," but instead should "be particularized to the facts

of the case." *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (per curiam) (internal quotations omitted); *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018). Here, the right at issue is an individual's student's right not to be racially discriminated against by and through the acts and omissions of school officials. Thus, the "ultimate question is whether the state of the law when the offense occurred" gave Carr "fair warning" that his conduct violated this right. *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 247 (3d Cir. 2016).

"The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 248–49 (3d Cir. 2016) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)

As noted, the Third Circuit has not ruled conclusively on the issue of whether there is a clearly established Fourteenth Amendment right protecting a student from an administrator's deliberate indifference to racial harassment by other students. In *George*, Judge Martini followed the Second Circuit insofar as he accepted that deliberate indifference to student-on-student harassment can be viewed as discrimination by school officials themselves and support a cause of action under the equal protection clause. But when he confronted the requirement that this right must be "clearly established," Judge Martini found that district court opinion in this circuit "have parted ways," and determined the fourteenth amendment right at issue was not sufficiently clearly established to create liability.

In *DiStiso v. Cook,* 691 F.3d 226, 241 (2d Cir.2012), the court denied summary judgment where a kindergarten student was called the n-word 8–15 times and teachers did not respond. Accepting the events of the basketball game as described, that school principal and superintendent Carr chose not to address deliberate sustained racial taunting of the one black student in the game and then ejected his father for reacting to it, the Court is reluctant to grant qualified immunity on academic grounds, preventing plaintiffs from adducing facts through discovery that may substantiate their constitutional claims. They have, after all, laid the groundwork. This ruling is made at the pleading stage; even though inappropriately timed, the defendants' arguments to the contrary in their papers indicate plaintiffs' allegations will be vigorously challenged. Plaintiffs are nonetheless entitled to proceed past the pleadings without being cut off by overly energetic application of the "clearly established" requirement given the highly charged and very public circumstances laid out in the complaint. The federal claims against Carr in his individual capacity will survive defendants' motion to dismiss.

### 2. *Claims against the Board of Education*

A school board may not be held liable for a constitutional violation under *respondeat superior. C.H. v. Oliva,* 226 F.3d 198, 202 (3d Cir. 2000). Rather, a school board may be "held responsible for a constitutional violation of a [school administrator] only if the violation is a result of a policy, custom or practice established or approved by the board." *Monnell v. New York Dep't of Social Servs.,* 436 U.S. 658 (1978); *C.H. v. Oliva,* 226 F.3d 198, 202 (3d Cir.2000).

To hold the Board liable, plaintiffs must allege that: "an unconstitutional policy or custom of the municipality led to his or her injuries…or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019), *cert. denied sub nom. City of Camden, New Jersey v. Forrest*, 140 S. Ct. 902 (2020) (internal quotations omitted); *see also Hashem v. Hunterdon Cty.*, 2016 WL 5539590, at *22 (D.N.J. Sept. 29, 2016) (Wolfson, J.).  A plaintiff may even bring a claim "based on a  single decision, where the decisionmaker is a municipal policymaker."  *Mrazek v. Stafford Twp.*, 2017 WL 1788655, at *9 (D.N.J. May 5, 2017, *aff'd*, 744 F. App'x 69 (3d Cir. 2018)) (Wolfson, J.).

 "Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict."  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (alteration in original) (internal quotation marks omitted); *see also Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019).  In contrast, custom can be established by showing that "a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  The plaintiff must "identify a custom or policy, and specify what exactly that custom or policy was," as well as "allege conduct by a municipal decisionmaker."  *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009). "Custom requires proof of knowledge and acquiescence by the decision maker."  *Id.*

Failure-to-train claims do not require that plaintiffs allege the existence of a municipal policy, and instead apply "to other failures and inadequacies by municipalities, including those related to supervision and discipline[.]" *Forrest,* 930 F.3d at 105. Plaintiffs must establish "deliberate indifference on the part of the municipality" which "consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)). A "claim alleging failure to take action" is only met "where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality can be found to be deliberately indifferent to the need." *Gretzula v. Camden Cty. Tech. Sch. Bd. of Educ.*, 965 F. Supp. 2d 478, 489 (D.N.J. 2013) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989) (Simandle, J.)

Plaintiffs assert that defendants "failed to be [New Jersey Harassment, Intimidation and Bullying ("NJHIB")] compliant." They allege that defendants "demonstrated a clear custom and practice of, at a minimum, willful indifference" to racially offensive behavior because they "possessed contemporaneous knowledge of: (1) the subject hate crimes; and (2) allowed said hate crimes to continue for such an extent that Defendants have willful indifference, while, at the same time, actively and tacitly communicating a message of approval of such offensive conduct within the

school and during a school basketball game." (Compl. ¶¶ 34-35.) The Court gleans from this that plaintiffs deem the events of the basketball game were sufficiently public, shocking, and protracted to constitute a custom and practice on the Board's part.

Plaintiffs further contend that defendants "fail[ed] to properly educate, train or otherwise inform their student body that such behavior is never acceptable which establishes a "clear custom and practice of, at a minimum, willful indifference to the behavior set out in detail above." (*Id.* ¶ 36.) The defendants have asserted in their papers that the events described in the complaint occurred in a gym full of "parents, students, coaches, administrators, a security guard and referees," in short, in a public arena hosted by the defendants. And according to the complaint, somehow the one black student athlete was subjected to a harrowing experience based on his race. In response, the sole disciplinary action taken was to eject that student's father. As the complaint avers, "As a whole…Defendants have demonstrated a gravely disappointing willful indifference to (and tacit and active approval) of the subject game's spectator's conduct." (*Id.* ¶ 38.)

The Court cannot ignore the seriousness of these allegations. At this stage of the litigation, without the benefit of discovery, the Court is constrained to deny defendants' motion. Taken the allegations in their best light, as the Court must, plaintiffs have plausibly alleged that the Board failed to implement policies to address an obvious inadequacy—its capacity to prevent, address, and remedy a patently racial incident. Plaintiffs are entitled to the opportunity to probe how and why this alleged

event unfolded as it did.  As such, defendants' motion is denied to the extent it seeks to dismiss the § 1983 and NJCRA allegations against the Board.

### B.    Violations of the New Jersey Law Against Discrimination (NJLAD)

In count one, plaintiffs allege that defendants permitted racial harassment against Nasir and his family and that these acts of discrimination violated the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-3.  The NJLAD was enacted to "eradicate discrimination whether intentional or unintentional."  *Lehmann v. Toys R Us, Inc.,* 132 N.J. 587, 604, 626 A.2d 445 (1993).  It prohibits discrimination "because of race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, liability for service in the American Armed Forces of the United States, or nationality."  N.J.S.A. § 10:5-3.  It also makes it unlawful "[f]or any. . . agent[ ] or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof…on account of the…race…of such person."  N.J.S.A. § 10:5–12(f).  "[A]ll persons shall have the opportunity to…obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation."  N.J.S.A. § 10:5-4.

### 1.    *Allegations against the Board of Education*

Defendants argue that plaintiffs' NJLAD claims against the Board should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim because they were not refused access to or asked to leave the school's gymnasium on account of their

race; Patricia, Stefanie, and Nasir were, at all times, permitted inside the gymnasium and Ashon was only asked to leave after giving the middle finger to other spectators. (Moving Brief, at 15.)  Defendants further contend that they acted reasonably given the circumstances: Carr asked Ashon to leave because he gave the finger in the presence of students and, once informed of the allegations, the Board indicated that it would investigate the incident.  (*Id.* at 18.)[1]

In response, plaintiffs assert that the NJLAD protects more than denial of access to or ejection from a public accommodation; the statute also prohibits the withholding or denial of the "advantages" and "privileges" of a public place on account of an individual's race and thus proscribes racially-motivated harassment, which plaintiffs have alleged.  (Opposition Brief, at 16.)  Plaintiffs also argue that because Ashon was thrown out for giving the finger, but white spectators who made the same gesture were not, Ashon's ejection must be related to race.  (*Id.*)  Plaintiffs further contend that defendants' reactions to the situation were unreasonable—Carr was present at the game and did nothing to limit the harassment experienced by Nasir and his family and the Board indicated that an investigation would take place.  (*Id.* at 15-19.)

---

[1] Defendants maintain that it is implausible that behavior as inappropriate as plaintiffs allege could go unaddressed by coaches, referees, and other school officials.  (Moving Brief, at 16-17).  On a motion to dismiss, however, plaintiffs' allegations are "entitled to the assumption of trust."  *Bistrian v. Levi*, 696 F.3d 252, 365 (3d Cir. 2012).  As such, defendants' alternative rendering of the events is not appropriately considered at this time.

### a.   <u>**Allegations concerning Nasir Dickerson**</u>

Plaintiffs allege that defendants created a hostile environment in violation of the NJLAD, and Nasir was harmed as a result.  The statute "permits a cause of action against a school district for student-on-student harassment based on [race] if the school district's failure to reasonably address that harassment has the effect of denying to that student any of a school's 'accommodations, advantages, facilities or privileges.'" *L.W. v. Toms River Reg'l Schs. Bd. of Educ.,* 189 N.J. 381, 402, 915 A.2d 535 (2007) (quoting N.J.S.A. 10:5–12(f)).  The New Jersey Supreme Court cautioned that a student does not have a claim based on "isolated schoolyard insults or classroom taunts" and instead, to establish a race-based harassment claim against a school district under the NJLAD, a plaintiff must prove "(1) 'discriminatory conduct that would not have occurred 'but for' the student's protected characteristic,' (2) 'that a reasonable student of the same age, maturity level, and protected characteristic would consider sufficiently severe or pervasive enough to create an intimidating, hostile, or offensive school environment,' and (3) 'the school district knew or should have known of the harassment, but failed to take action reasonably calculated to end the harassment.'" *George v. Bd. of Educ. of the Twp. of Millburn*, 34 F. Supp. 3d 442, 456 (D.N.J. 2014) (citing *L.W. v. Toms River Reg'l Schs. Of Educ.*, 189 N.J. 381, 402-403 (2007)).

A student "seeking to prevail on a hostile environment claim must establish that the complained of conduct was 'severe or pervasive enough to' create a hostile environment." *L.L. v. Evesham Township Board of Education*, 710 Fed. App'x 545 (3d Cir.

2017) (quoting *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 277 (3d Cir. 2001)).   The "severe or pervasive" test "conforms to the standard for establishing workplace racial or gender harassment under federal Title VII law." *Taylor v. Metzger*, 152 N.J. 490, 498 (1998); *see also Watkins v. Nabisco Biscuit Co.*, 224 F. Supp. 2d 852, 863–64 (D.N.J. 2002) (Greenaway, J.)  Under the severe or pervasive standard, "one incident of harassing conduct can create a hostile [ ] environment." *Taylor*, 152 NJ at 498 (citing *Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 626 A.2d 445, 455 (1993)).  Although a single incident may be severe enough to establish a prima facie case of a hostile environment, "it will be a rare and extreme case in which a single incident will be so severe that it would, from the perspective of a reasonable person situated as the claimant, make the [ ] environment hostile.'" *Taylor*, 152 N.J. at 498 (citing *Lehmann,* 626 A.2d at 455).  However, ordinarily, "repeated racial slurs must form the basis for finding that a hostile [ ] environment has been created." *Taylor,* 706 A.2d at 500.

With respect to the final prong, the NJLAD "recognizes vicarious liability: a supervisor's actual or constructive knowledge can be imputed to a school district." *George v. Board of Educ. of the Tp. Of Millburn*, 34 F.Supp.3d 442, 456 (D.N.J. July 23, 2014) (Martini, J.); *see also E.K. v. Massaro*, 2013 WL 5539357, at *8 (D.N.J. Oct. 7, 2013) (Debevoise, J.) ("[A] school is liable for a hostile school environment when it grants a supervisor authority to control the school environment and the supervisor either abuses that authority or has actual or constructive knowledge of the harassment and fails to take effective measures to end the discrimination.") (internal quotations and citations

omitted.)  The *L.W.* Court noted that a school cannot be expected to purge itself of all peer-on-peer harassment, but that it must "implement effective preventative and remedial measures to curb severe or pervasive discriminatory mistreatment." *Id.* at 407.

Plaintiffs allege that defendants "actively permitted a hostile, harassing and nearly violent environment" for the plaintiffs, the only African Americans present at the game. (Compl.  ¶ 27.)  Specifically, plaintiffs maintain that "[t]hroughout the entirety of the subject game, large numbers of spectators made monkey sounds and shouted [the n-word] and "monkey" toward Nasir," the only black player at the game.  (*Id.* ¶¶ 3, 5-6.) This is overtly racist behavior and was directed exclusively at Nasir and his family.  As such, the Court finds that plaintiffs have set forth a plausible claim of "discriminatory conduct that would not have occurred 'but for [Nasir's] protected characteristic'"—his race.  *L.W.*, 189 N.J. at 402.

At the time of the incident, Nasir was between 17 and 18 years old.  (Compl. ¶¶ 3, 10.)  Plaintiffs contend that, despite the "obscene ruckus" and "rally of hatred" described above, neither game nor school officials did anything to stop the spectators' "racial slurs or monkey sounds."  (*Id.* ¶ 7.)  Plaintiffs further allege that, near the end of the game, the "slurs became louder and far more aggressive," which caused Nasir to "fear for his safety and life."  (*Id.* ¶ 8-9.)  Thus, although this incident occurred during the span of one basketball game, plaintiffs maintain that the racially motivated taunting was so aggressive that Nasir feared for his life.  Calling a black person "monkey" or the n-word has an "unambiguously demeaning racial message…[these are] patently racial

slur[s], and [are] ugly, stark and raw in [their] opprobrious connotation." *See Taylor*, 152 N.J. at 502-503 (finding single incident of referring to employee as a "jungle bunny" to be severe); *Castleberry v. STI Group*, 863 F.3d 259, 264-65 (3d Cir. 2017) (finding the isolated use of the n-word to be severe where accompanied with threats of termination). Taking plaintiffs' allegations as true and making all reasonable inferences in their favor, a reasonable black student of the same age and maturity level of Nasir could consider the alleged behavior of the Wallkill student spectators to be severe enough to create hostile and intimidating environment. Although there is no allegation that Carr himself uttered racist epithets, plaintiffs have alleged that he heard the spectators' remarks and only responded by ejecting Nasir's father, one of the few black spectators present at the game. This response further suggests that a reasonable student similar to Nasir would consider the environment intimidating.

The final prong requires the Court to consider whether plaintiffs have plausibly alleged that the Board knew or should have known about the racist bullying Nasir experienced at the game. Because the Board may be held vicariously liable for Carr's actions, the relevant inquiry is whether Carr, who was present at the game, "knew or should have known about the harassment, but failed to take action reasonably calculated to end the harassment." *George*, F.Supp.3d at 456. The Court may consider the following factors when assessing the reasonableness of a school district's action: "students' ages, developmental and maturity levels; school culture and atmosphere; rareness or frequency of conduct; duration of harassment; extent and severity of the

conduct; whether violence was involved; history of harassment within the school district, the school, and among individual participants; effectiveness of the school district's response; whether the school district considered alternative responses; and swiftness of the school district's reaction." *Id.* at 457.

Plaintiffs have sufficiently alleged that defendants knew or should have known of the harassment.  Plaintiffs stated in their complaint that Carr was "fully aware of the racist, dangerous, hostile and obscene display being generated by spectators" because he was present at the game.  (Compl. ¶¶ 5,7.)  Moreover, plaintiffs assert that Ashon made Carr aware of the problematic behavior.  As he was being ejected, Ashon said to Carr and the security officer, "You don't hear them over there, you don't see them over there?"  (Compl. ¶ 15.)

Plaintiffs have also sufficiently alleged that Carr did not take action reasonably calculated to end the harassment.  Plaintiffs alleged that Carr did not "take any meaningful action with respect to the spectators' obscene and aggressive conduct" or remedy the situation while it was ongoing.  (*Id.* ¶ 27.)  By defendants' own admission, Carr made no official report of student on student harassment.  (Moving Brief, at 18.)

Defendants nevertheless direct the Court's attention to N.J.S.A § 18A:37-16(c) in support of their claim that the Board is immunized from liability because Carr eventually reported the incident to the Board.  (Moving Brief, 19.) It states:

> A member of a board of education or a school employee who promptly reports an incident of harassment, intimidation or bullying, to the appropriate school official designated by the school district's policy, or to any school administrator

or safe schools resource officer, and who makes this report in compliance with the procedures in the district's policy, is immune from a cause of action for damages arising from any failure to remedy the reported incident.  N.J.S.A § 18A:37-16(c).

 Defendants argue that N.J.S.A § 18A:37-16(d) further insulates Carr's conduct:

A school administrator who receives a report of harassment, intimidation, or bullying from a district employee, and fails to initiate or conduct an investigation, or who should have known of an incident of harassment, intimidation, or bullying and fails to take sufficient action to minimize or eliminate the harassment, intimidation, or bullying, may be subject to disciplinary action.

These provisions are not applicable to the alleged facts.  Plaintiffs have asserted that race-based harassment occurred directly in front of Carr, and while it was ongoing, he did nothing to stop it, aside from ejecting Ashon.  They do not claim that he learned of the spectators' behavior after the fact and then failed to report or investigate it.  The second half of the statute is directly relevant here because plaintiffs have alleged that Carr was a "school administrator…who should have known of an incident of harassment, intimidation or bullying and fail[ed] to take sufficient action to minimize or eliminate the harassment, intimidation, or bullying," and as such, neither Carr nor the Board are entitled to immunity at this stage of the case.  N.J.S.A § 18A:37-16(d).

### b.   **Allegations concerning Ashon Dickerson**

Because Ashon was ejected and thus denied access to the gymnasium, his claim is assessed under a different standard.  The elements required for him to bring a public accommodation claim under N.J.S.A. 10:5-12(f) are that "(1) defendant operates a place of public accommodation; (2) the plaintiff is a member of a protected class; and (3) he

or she was denied equal treatment on the basis of his or her membership in a protected class." *Islam v. City of Bridgeton*, 804 F. Supp. 2d 190, 200 (D.N.J. 2011) (Simandle, J.); *Dasrath v. Continental Airlines, Inc.*, 2006 WL 372980 (D.N.J. Feb. 16, 2006) (Debevoise, J.) (citing N.J.S.A. 10:5-12(f)(1)).

Plaintiffs have sufficiently alleged that defendants operate a place of public accommodation, a school gymnasium, and that Ashon is a member of a protected class—he is black.  N.J.S.A. § 10:5-5(1).

Defendants argue that Ashon was not ejected from the game on the basis of his race, but rather, because he used a middle finger gesture.  (Moving Brief, at 15.)  In response, plaintiffs argue that Ashon was asked to leave for making the same gesture that white spectators also made, but they were not asked to leave.  (Opposition Brief, at 16.)   Plaintiffs concede that "Ashon was ejected for returning a middle [finger] gesture," but they further allege that "numerous other spectators directed [this same gesture] at Ashon," and these individuals were not ejected, thus evidencing Carr's ulterior, race-based motive.  (Compl. ¶ 25.)  Accepting plaintiffs' allegations about this incident as true as the Court is obligated to do at this stage, the Court concludes that plaintiffs have sufficiently pled a violation of the NJLAD.

### c.   Allegations concerning Patricia and Stefanie

Defendants argue that Stefanie and Patricia's claims should be dismissed for lack of standing because they have not suffered a concrete and particularized injury. (Moving Brief, at 16.)  The plaintiff, as the party invoking federal jurisdiction, carries

the burden of establishing the requirements of Article III standing: (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. V. Robins*, 136 S.Ct. 1540, 1547. An injury in fact requires an "invasion of a legally protected interest which is [] concrete and particularized." *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

NJLAD prohibits discrimination because of race. N.J.S.A. 10:5-3. Although it appears that Nasir was the target of the majority of the crowd's racial taunts, plaintiffs have alleged that the racial slurs and harassing behavior were directed at the entire family, including Stefanie and Patricia. (Compl. ¶ 12) ("At this rate, it was clear that the slurs were being directed toward Ashon, Nasir, Stefanie and Patricia.") Once again, the Court confronts the procedural posture of the case: the issue is sufficiency of the pleadings. The complaint alleges and the facts plausibly support that the family members were targets, and therefore plaintiffs have sufficiently pled that both Stefanie and Patricia were also discriminated against and denied equal access to the advantages and privileges of a public place on account of their race.

### 2.   *Allegations against Carr*

Plaintiffs' NJLAD claim is also directed at Carr in his individual capacity. Individual liability under the NJLAD only arises through aiding and abetting liability. *See Cicchetti v. Morris Cnty. Sheriff's Office,* 194 N.J. 563, 594, 947 A.2d 626 (2008). Aiding and abetting liability takes two forms: active, which requires "knowing and substantial assistance," *Tarr v. Ciasulli,* 181 N.J. 70, 853 A.2d 921, 929 (N.J.2004) (quoting *Hurley*

27

*v. Atlantic City Police Dep't,* 174 F.3d 95, 127 (3d Cir.1999)), or passive which requires that a "supervisor holds a duty to act against harassment and yet remains deliberately indifferent to its existence." *Lopez–Arenas v. Zisa,* 2012 WL 933251, at *10 (D.N.J. Mar. 19, 2012) (Salas, J.) (citing *Hurley,* 174 F.3d at 126). Defendants argue that plaintiffs have failed to "properly allege aiding and abetting liability under the law, as [Carr] neither encouraged nor assisted any wrongful conduct." (Opposition Brief, at 13-14.) As discussed in detail above, plaintiffs have alleged that Carr was not only aware of the racially motivated harassment, but also present while it was ongoing. Further, he did nothing to put an end to it except to eject Ashon. Plaintiffs have therefore sufficiently alleged Carr was deliberately indifferent to the wrongful conduct, despite having a duty as the superintendent to respond. As such, defendants' motion to dismiss as to plaintiffs' NJLAD claims against Carr in both his individual and personal capacity is denied.

## VI.   <u>Conclusion</u>

For the foregoing reasons, the Court denies defendants' motion. An appropriate order will follow.

/s/ Katharine S. Hayden

Date: June 1, 2020                    Katharine S. Hayden, U.S.D.J.